Richard G. EVANS, Angela Romero, Linda Fowler, Paul Brown, Priscilla Inkpen, John Miller, The Boulder Valley School District Re–2, The City and County of Denver, The City of Boulder, The City of Aspen, and The City Council of Aspen, Plaintiffs–Appellees,

v.

Roy ROMER, as Governor of the State of Colorado, and the State of Colorado, Defendants–Appellants.

Nos. 94SA48, 94SA128.

Supreme Court of Colorado, En Banc.

Oct. 11, 1994.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Jeanne Winer, Boulder, Holland & Hart, Gregory A. Eurich, American Civ. Liberties Union of Colorado, David H. Miller, City and County of Denver, City Atty., Darlene M. Ebert, Asst. City Atty., Denver, Boulder City Atty., Joseph N. deRaismes, III, Jane W. Greenfield, Boulder, Aspen City Atty., John Paul Worcester, Aspen, Special Counsel for City of Aspen and Aspen City Counsel, Edward M. Caswall, Telluride, American Civ. Liberties Union Foundation, William B. Rubenstein, Matthew A. Coles, Lambda Legal Defense and Educ. Fund, Inc., Suzanne B. Goldberg, New York City, Wilson, Sonsini, Goodrich & Rosati, Clyde J. Wadsworth, Palo Alto, CA, Roderick M. Hills, Jr., Ann Arbor, MI, for plaintiffs-appellees.

Gale A. Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Paul Farley, Deputy Attys. Gen., Denver, for defendants-appellants.

Keith E. Abbott, Greeley, for amicus curiae for Family Research Institute.

The Nat. Legal Foundation, Robert K. Skolrood, Virginia Beach, VA, for amicus curiae Colorado for Family Values.

Chief Justice ROVIRA delivered the Opinion of the Court.

Defendants, Roy Romer, Governor of the State of Colorado, Gale A. Norton, Attorney General of the State of Colorado, and the State of Colorado (defendants) appeal the trial court's entry of a permanent injunction enjoining them from enforcing a voter-initiated amendment to the Colorado Constitution ("Amendment 2"). We affirm.

## I

In May 1992, petitions which would amend the Colorado Constitution by adding a new section 30b to article II were filed with the secretary of state. The proposed amendment was put to the voters as Amendment 2 on November 3, 1992, and passed by a vote of 813,966 to 710,151 (53.4% to 46.6%). The secretary of state certified the results on December 16, 1992, as required by article V, section 1, of the state constitution.

Amendment 2 provides:

**No Protected Status Based on Homosexual, Lesbian, or Bisexual Orientation.** Neither the State of Colorado, through any of its branches or departments, nor any of its agencies, political subdivisions, municipalities or school districts, shall enact, adopt or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation, conduct, practices or relationships shall constitute or otherwise be the basis of or entitle any person or class of persons to have or claim any minority status quota preferences, protected status or claim of discrimination.

This Section of the Constitution shall be in all respects self-executing.

On November 12, 1992, Richard G. Evans, along with eight other persons, the Boulder Valley School District RE–2, the City and County of Denver, the City of Boulder, the City of Aspen, and the City Council of Aspen (plaintiffs) filed suit in Denver District Court to enjoin the enforcement of Amendment 2 claiming that the amendment was unconstitutional.

The trial court conducted an evidentiary hearing to consider plaintiffs' motion for a preliminary injunction. Subsequently, the court granted the motion and prohibited the defendants from enforcing Amendment 2 pending the outcome of a trial on the merits.[1]

The defendants appealed pursuant to C.A.R. 1(a)(3), and we granted review. *See Evans v. Romer,* 854 P.2d 1270 (Colo.1993) (*Evans I* ). In *Evans I,* we first addressed the question of the legal standard to be applied in reviewing the trial court's entry of the preliminary injunction. Following the precedent of the United States Supreme Court, we held that "the Equal Protection Clause of the United States Constitution protects the fundamental right to participate equally in the political process," and "that any legislation or state constitutional amendment which infringes on this right by 'fencing out' an independently identifiable class of persons must be subject to strict judicial scrutiny." *Id.* at 1282.

After recognizing that "[t]he immediate objective of Amendment 2 is, at a minimum, to repeal existing statutes, regulations, ordinances, and policies of state and local entities that barred discrimination based on sexual orientation" and that the " 'ultimate effect' of Amendment 2 is to prohibit any governmental entity from adopting similar, or more protective statutes, regulations, ordinances, or policies in the future unless the state

constitution is first amended to permit such measures," we held:

> [T]he right to participate equally in the political process is clearly affected by Amendment 2, because it bars gay men, lesbians, and bisexuals from having an effective voice in governmental affairs insofar as those persons deem it beneficial to seek legislation that would protect them from discrimination based on their sexual orientation. Amendment 2 alters the political process so that a targeted class is prohibited from obtaining legislative, executive, and judicial protection or redress from discrimination absent the consent of a majority of the electorate through the adoption of a constitutional amendment. Rather than attempting to withdraw antidiscrimination issues as a whole from state and local control, Amendment 2 singles out one form of discrimination and removes its redress from consideration by the normal political processes.

*Id.* at 1285. We concluded that the trial court did not err in granting the preliminary injunction enjoining defendants from enforcing Amendment 2.

After our decision in *Evans I,* the case was remanded to the trial court to determine whether Amendment 2 was supported by a compelling state interest and narrowly tailored to serve that interest. *Id.* at 1286. At trial the defendants offered six "compelling" state interests: (1) deterring factionalism; (2) preserving the integrity of the state's political functions; (3) preserving the ability of the state to remedy discrimination against suspect classes; (4) preventing the government from interfering with personal, familial, and religious privacy; (5) preventing government from subsidizing the political objectives of a special interest group; and (6) promoting the physical and psychological well-being

---

1. The trial court concluded that plaintiffs had met the threshold requirement of *Rathke v. MacFarlane,* 648 P.2d 648 (Colo.1982), by demonstrating that enjoining the enforcement of Amendment 2 was necessary to protect their right to equal protection of the laws under the United States Constitution. The trial court then determined that because Amendment 2 may burden a fundamental constitutional right, its constitutionality must be assessed by reference to the "strict scrutiny" standard of review. The court concluded that under this standard, plaintiffs had shown to a reasonable probability that Amendment 2 would be demonstrated to be unconstitutional beyond a reasonable doubt at a trial on the merits.

of Colorado children.[2]

The trial court concluded that the interest in deterring "factionalism" was in truth, nothing more than an attempt to impede the expression of "a difference of opinion on a controversial political question. . . ." It concluded that the first governmental interest was not a compelling state interest but rather, that "the *opposite* of defendants' claimed compelling interest is most probably compelling," i.e., encouraging the competition of ideas with uninhibited, robust, and wide-open political debate.

The trial court found that the interest of preserving the State's political functions, premised on the Tenth Amendment right of the states to amend state constitutions, was not a compelling interest since "[d]efendants' legal argument is not supported by federal or state case law, nor is it supported by the Colorado Constitution."

With respect to the interest in preserving the ability of the state to remedy discrimination against groups which have been held to be suspect classes, the trial court stated its doubt as to whether fiscal concerns of the state rise to the level of a compelling state interest. The court held that Amendment 2 could not be understood to further this interest because,

> [d]efendants' evidence was principally in the form of opinion and theory as to what *would* occur if a Denver type ordinance were adopted as a state statute. There is no such statute, nor is one proposed. Plaintiffs' evidence was based on what *has happened* over the course of eleven years in Wisconsin, and during the time in which the Denver ordinance has included a sexual orientation provision. Those actual experiences show that the presence of a sexual orientation provision has *not* increased costs or impaired the enforcement of other civil rights statutes or ordinances.

Thus, the trial court concluded that "defendants' offered evidence of lack of fiscal ability [is] unpersuasive in all respects."

The trial court held that preventing the government from interfering with personal, familial, and religious privacy was, in part, a compelling state interest. Although the court acknowledged promotion of family privacy is a compelling state interest, it held that defendants never established what they meant by the term "family." Moreover, defendants failed to "tie-in . . . the interest of protecting the family and denying gays and bisexuals the right to political participation. . . ."

The trial court also found that preserving religious liberty was a compelling state interest. However, it held that Amendment 2 was not narrowly tailored to serve this interest. "The narrowly focused way of addressing [antidiscrimination protections for gay men, lesbians, and bisexuals] is to add to it a religious exemption such as is found in the Denver and Aspen ordinances, not to deny gays and bisexuals their fundamental right of participation in the political process."

The trial court rejected the personal privacy component of the argument on the grounds that "[t]he general issue of whether personal privacy is a compelling state interest was not adequately established. The court can only speculate as to what defendants mean by personal privacy and how Amendment 2 protects such a right."

The interest in preventing government from subsidizing the political objectives of a special interest group was rejected on the grounds that "[t]his claimed compelling interest was not supported by any credible evidence or any cogent argument, and the court concludes that it is not a compelling state interest."

Similarly, the trial court rejected the argument that the protection of children is a compelling state interest served by Amendment 2 because "[d]efendants have failed to present sufficient evidence to support this claimed compelling interest."

██ Accordingly, because the trial court concluded that Amendment 2 was not necessary to support any compelling state interest and narrowly tailored to meet that interest, it

---

**2.** The state has not reasserted the sixth interest on appeal.

permanently enjoined the enforcement of Amendment 2.[3]

On appeal the defendants argue that: (1) the legal standard set forth by this Court in *Evans I* for assessing the constitutionality of Amendment 2 should be reconsidered; (2) Amendment 2 is supported by several compelling state interests and is narrowly tailored to meet those interests; (3) that the unconstitutional provisions of Amendment 2 are severable from the remainder; and (4) Amendment 2 is a valid exercise of state power under the Tenth Amendment to the United States Constitution.

## II

Defendants first ask that we reconsider the constitutional principles articulated in *Evans I*, but they offer no arguments that were not then considered and rejected by this court. We see no reason to revisit that decision. We reaffirm our holding that the constitutionality of Amendment 2 must be determined with reference to the strict scrutiny standard of review.[4]

## III

■ A legislative enactment which infringes on a fundamental right or which burdens a suspect class is constitutionally permissible only if it is *"necessary* to promote a *compelling* state interest," *Dunn v. Blumstein*, 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972), and does so in the least restrictive manner possible. *Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982). The question of what constitutes a compelling state interest is one of law and thus, we review the trial court's ruling *de novo*. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 986 F.2d 728, 772 n. 30 (5th Cir.1993); *Scott v. Rosenberg*, 702 F.2d 1263, 1274 (9th Cir.

---

**3.** The court rejected plaintiffs' argument that gay men, lesbians, and bisexuals should be found to be either a "suspect class" or a "quasi-suspect class." The trial court rejected this argument because it concluded that "[h]omosexuals fail to meet the element of political powerlessness and therefore fail to meet the elements [necessary] to be found a suspect class." This ruling has not been appealed and thus, we do not address it.

The trial court also declined plaintiffs' request to analyze the constitutionality of Amendment 2 under the "rational basis test." In so doing, it stated:

The Colorado Supreme Court has ruled that Amendment 2 invades a fundamental right of an identifiable group and that the test to be applied is the strict scrutiny test. The rational basis test is to be used when there is no fundamental right or suspect class involved. Therefore this court declines to apply a legally inappropriate test to this case.

Plaintiffs have again argued to this court that Amendment 2 does not pass constitutional muster under the less stringent rational basis test. They argue that each of the state's purported compelling interests are not rationally related to the enactment of Amendment 2. Because we decline to revisit our holding in *Evans I, see infra* Part II, and again conclude that Amendment 2 affects a fundamental right, its constitutionality must be analyzed under the strict scrutiny standard of review. *See Plyler v. Doe*, 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982) ("laws that impinge upon the exercise of a 'fundamental right' [require] the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest").

**4.** After this court decided *Evans I*, a Federal District Court enjoined the enforcement of a voter enacted amendment to the Cincinnati, Ohio city charter almost identical to Amendment 2, which prohibited the city from enacting any ordinance, regulation, rule or policy which entitled gay men, lesbian or bisexual individuals to minority or protected status. *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 838 F.Supp. 1235 (S.D.Ohio 1993) (*Equality I*). The court found it highly likely that the right to participate equally in the political process is a fundamental right, protected by the Equal Protection Clause and requires strict judicial scrutiny on review. The court concluded relevant Supreme Court precedent supported the proposition that "[s]tates may not disadvantage *any* identifiable group, whether a suspect category or not, by making it more difficult to enact legislation on its behalf." *Id.* at 1241 (citing *Evans I*, 854 P.2d 1270, 1281, 1283 (Colo.1993); *Gordon v. Lance*, 403 U.S. 1, 7, 91 S.Ct. 1889, 1892–93, 29 L.Ed.2d 273 (1971); *Hunter v. Erickson*, 393 U.S. 385, 393, 89 S.Ct. 557, 561–62, 21 L.Ed.2d 616 (1969)). After a trial on the merits, the court made the injunction permanent holding *inter alia* that the amendment violated the plaintiffs' fundamental right to equal access to the political process. *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati,*, 860 F.Supp. 417, 430 (S.D.Ohio 1994). The court explained "any legislation that disadvantages an independently identifiable group of people by making it more difficult for that group to enact legislation in its behalf, 'fences' that group out of the political process, and thereby violates their fundamental rights." *Id.* (citing *Equality I*, 838 F.Supp. at 1238–42; *Evans I*, 854 P.2d at 1282.).

1983). Defendants argue that Amendment 2 is supported by a number of compelling state interests and is narrowly tailored to serve those interests.[5]

## A

 Defendants' first asserted governmental interest is in protecting the sanctity of religious, familial, and personal privacy. Freedom of religion is expressly guaranteed by both the First Amendment to the United States Constitution and article II, section 4 of the Colorado Constitution and stands at the core of our Nation's history and tradition. It is among the highest values of our society. *See Murdock v. Pennsylvania*, 319 U.S. 105, 115–17, 63 S.Ct. 870, 876–77, 87 L.Ed. 1292 (1943). There can be little doubt that ensuring religious freedom is a compelling governmental interest.

 Defendants argue that Amendment 2 is necessary to serve this interest because "[u]nder the ordinances preempted by Amendment 2, individual landlords or employers who have deep-seated and profound religious objections to homosexuality would nonetheless be compelled to compromise those convictions, under threat of government sanctions." In support of this proposition, defendants rely on *Smith v. Commission of Fair Employment & Hous.*, 25 Cal. App.4th 251, 30 Cal.Rptr.2d 395 (3 Dist.1994), *pet. for review granted and opinion superseded by Smith v. Fair Employment & Hous. Comm'n*, 33 Cal.Rptr.2d 567, 880 P.2d 111 (Cal.1994). (*See* Cal.Ct.Rules 976(d) opinion withdrawn from publication pending review).

In *Smith*, the plaintiff challenged the ruling of the California Commission of Fair Employment and Housing which found that she had impermissibly discriminated, based on their marital status, against a couple who sought to rent housing. The couple was unmarried and the plaintiff refused to rent to them on the grounds that doing so would violate her deeply-held religious beliefs. Plaintiff was ordered to cease and desist marital discrimination; post a notice announcing her violation of California law for ninety days; permanently post a notice to rental applicants of their rights and remedies under California antidiscrimination laws; and sign both notices and provide copies to each person who subsequently expressed an interest in renting her property. *Id.* 30 Cal. Rptr.2d at 397–98.

The California court of appeals concluded that the commission's order substantially burdened plaintiff's free exercise rights because she "cannot remain faithful to her religious convictions and beliefs and yet rent to unmarried couples." *Id.* 30 Cal.Rptr.2d at 399.[6]

Assuming *arguendo* that ordinances such as that in effect in Boulder, which prohibit discrimination against gay men, lesbians, and bisexuals in housing and employment but which contain no exception for religiously-based objections, substantially burden the religious liberty of those who object to renting or employing gay men, lesbians, or bisexuals on religious grounds, the enactment of Amendment 2 clearly is not narrowly tailored to serve the interest of ensuring religious

---

5. We note at the outset that defendants argue that all of the asserted compelling interests which support Amendment 2 are narrowly tailored on the grounds that "there is absolutely *no other way* that the people could further the common elements of the various compelling interests but through the enactment of Amendment 2." We do not specifically address this argument for two reasons. First, as will be made clear below, none of the interests identified by defendants are compelling. Second, defendants never articulate what the "common elements of the various compelling interests" are, and we are simply unable to ascertain any specific "common elements" which all of those interests share.

6. Nevertheless, the court held, "it is clear that free exercise of religion as protected by the First

Amendment is not actionably infringed by applying to plaintiff a facially neutral statute which merely proscribes marital status discrimination, notwithstanding plaintiff's religious scruples against renting to unmarried couples." *Id.* 30 Cal.Rptr.2d at 401. This conclusion was reached based on the fact that "if prohibiting the exercise of religion ... is not the object of the [law] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." *Id.* 30 Cal. Rptr.2d at 400 (quoting *Employment Div., Ore. Dept. of Human Res. v. Smith*, 494 U.S. 872, 878, 110 S.Ct. 1595, 1599–1600, 108 L.Ed.2d 876 (1990)).

liberty. To the contrary, an equally effective, and substantially less onerous way of accomplishing that purpose simply would be to require that antidiscrimination laws which include provisions for sexual orientation also include exceptions for religiously-based objections. This is precisely what the Denver antidiscrimination laws provide. Denver, Colo., Rev.Mun.Code art. IV, §§ 28–92, 28–93, 28–95 to 28–97 (1992 Supp.). Similar exemptions for religious organizations are found in federal antidiscrimination statutes. *See, e.g.,* 42 U.S.C. § 2000e–1 (1994 Supp.) (exempting religious organizations from the prohibition against employment discrimination); 42 U.S.C. § 3607 (1994 Supp.) (exemption for religious organizations in housing and public accommodation).[7] Defendants do not, and we doubt that they could, argue that the Denver ordinance impairs religious freedom. Indeed, Joseph Broadus, who testified as an expert witness on behalf of the defendants, testified that imposing a religiously-based exemption on antidiscrimination laws intended to protect gay men, lesbians, and bisexuals would be less restrictive than Amendment 2 and would adequately address any concerns about religious liberty.

It is clear that Amendment 2, which affects the fundamental right of gay men, lesbians, and bisexuals to participate equally in the political process, is not the least restrictive means of ensuring religious liberty, and is not narrowly tailored to serve the compelling governmental interest in ensuring the free exercise of religion.

■ Defendants also argue that Amendment 2 serves the compelling interest of preserving "familial privacy." Family privacy is characterized by defendants as the right "of some parents to teach traditional moral values" to their children. As support, defendants cite authority recognizing the sanctity of the family and the central role the family plays in society. *See, e.g., Moore v. City of East Cleveland,* 431 U.S. 494, 503–04, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977) ("the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition"); *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968) (parental role is "basic in the structure of our society").

Defendants contend that the "right of familial privacy" is "severely undermine[d]" by the enactment of antidiscrimination laws protecting gay men, lesbians, and bisexuals because "[i]f a child hears one thing from his parents and the exact opposite message from the government, parental authority will inevitably be undermined." This argument fails because it rests on the assumption that the right of familial privacy engenders an interest in having government *endorse* certain values as moral or immoral. While it is true that parents have a constitutionally protected interest in inculcating their children with their own values, *see Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), defendants point to no authority, and we are aware of none, holding that parents have the corresponding right of insuring that government endorse those values.

■ The United States Supreme Court has repeatedly held that the individual's right to profess or practice certain moral or religious beliefs does not entail a right to have government itself reinforce or follow those beliefs or practices. *See, e.g., Bowen v. Roy,* 476 U.S. 693, 699, 106 S.Ct. 2147, 2151–52, 90 L.Ed.2d 735 (1986) ("Never to our knowledge has the Court ... require[d] the Government *itself* to behave in ways that the individual

---

**7.** We do not rule today on the adequacy of any religious exemptions contained in existing antidiscrimination laws. The question whether antidiscrimination laws violate the free exercise clause of the First Amendment by prohibiting discrimination based on marital status has recently been addressed by two state supreme courts with mixed results. *See Attorney General v. Desilets,* 418 Mass. 316, 636 N.E.2d 233 (1994) (Statutory mandate that landlords cannot discriminate against cohabiting unmarried cou-

ples substantially burdened landlords' sincerely held religious belief protected by the Massachusetts state constitution. Case remanded to decide whether a compelling governmental interest in eliminating such discrimination justified the infringement); *Swanner v. Anchorage Equal Rights Comm'n,* 874 P.2d 274 (Alaska 1994) (enforcement of facially neutral fair housing laws did not violate a landlord's right to free exercise of religion under either the state or federal constitution).

believes will further his or her spiritual development or that of his or her family.''). Furthermore, it is clear that the government does not burden an individual's constitutional rights merely because it endorses views with which that individual may disagree. *See Block v. Meese,* 793 F.2d 1303, 1312–14 (D.C.Cir.1986) (then Judge Scalia concluding that "[a] rule excluding official praise or criticism of ideas would lead to the strange conclusion that it is permissible for the government to prohibit racial discrimination, but not to criticize racial bias; to criminalize polygamy, but not to praise the monogamous family...."). *Id.* at 1313.

Consequently, fully recognizing that parents have a "privacy" right to instruct their children that homosexuality is immoral, we find that nothing in the laws or policies which Amendment 2 is intended to prohibit interferes with that right. With or without Amendment 2, parents retain full authority to express their views about homosexuality to their children. We believe that Amendment 2 is neither necessary nor narrowly tailored to preserve familial privacy because that right is not implicated by the laws and policies which Amendment 2 proscribes.

█ Defendants also argue that Amendment 2 serves the compelling state interest in preserving "personal privacy." While it is not entirely clear what is meant by the phrase, it appears that the defendants are referring to the right of "associational privacy" which will be impaired in the absence of Amendment 2 because individuals may be forced to associate with gay men, lesbians, and bisexuals in the rental of housing.[8]

█ As the Supreme Court has explained, the right of associational privacy protects associations involving,

deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.... [T]hey are distinguished by such attributes as relative smallness, a high degree of selectivity in the decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty.

*Roberts v. United States Jaycees,* 468 U.S. 609, 620, 104 S.Ct. 3244, 3250–52, 82 L.Ed.2d 462 (1984).

While preserving associational privacy may rise to the level of a compelling state interest, Amendment 2 is not narrowly tailored to serve that interest. Amendment 2 would forbid governmental entities from prohibiting discrimination against gay men, lesbians, and bisexuals (because they are gay, lesbian, or bisexual) in *all* aspects of commercial and public life, no matter how impersonal. Amendment 2 affects a vast array of affiliations which in no way implicate associational privacy. None of the criteria needed to precipitate associational privacy rights exists: there is no "special community" distinguished by "selectivity," "relative smallness," or any concern with "distinctively personal aspects of one's life." *Id.*

[A]n association lacking these qualities— such as a large business enterprise—seems remote from the concerns giving rise to this constitutional protection. Accordingly, the Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse that would not

---

**8.** The defendants' entire argument addressing the issue of personal privacy constitutes a single paragraph. It reads:

The court below found that both religious liberty and familial privacy are indeed compelling interests. However, the court rejected the notion that personal privacy could be a compelling interest, finding that the Defendants had addressed it only "tangentially." This finding ignores testimony such as that offered by Ann Ready of Madison, Wisconsin, who

shared a house with four other women, but refused to share it with a lesbian. She stated that she "had rejected several heterosexual males for the same reason, namely the potential for [unwanted] physical, sexual attraction." Ms. Ready was subsequently found to have violated both municipal and state sexual orientation laws. That preventing this sort of intrusion into personal matters of the utmost privacy is a compelling interest, should be obvious. (citations to the record omitted).

apply to regulations affecting the choice of one's fellow employees.

*Id.* (citing *Loving v. Virginia,* 388 U.S. 1, 12, 87 S.Ct. 1817, 1823–24, 18 L.Ed.2d 1010 (1967) and *Railway Mail Ass'n v. Corsi,* 326 U.S. 88, 93–94, 65 S.Ct. 1483, 1487–88, 89 L.Ed. 2072 (1945)).

To the extent that antidiscrimination laws protecting gay men, lesbians, and bisexuals have the potential to implicate associational privacy rights, a narrower way of avoiding this conflict would be to exempt the sort of intimate associations identified in *Roberts* from the scope of such laws. For instance, landlords could be allowed to discriminate against homosexuals in the rental of owner-occupied housing—the so-called "Mrs. Murphy's Boarding House" exception. *See, e.g.,* Fair Housing Act, 42 U.S.C. § 3603(b) (1988 & 1994 Supp.) (exempting certain owner-occupied housing from the Fair Housing Act); *Statutory History of the United States: Civil Rights, Part II* 1741–52, 1805–06 (B. Schwartz ed. 1970) (detailing legislative history and policies underlying "Mrs. Murphy's Boarding House" exemption in Fair Housing Act). Similar exemptions already exist under Colorado law. For instance, Denver's antidiscrimination ordinance exempts from its housing and public accommodation provisions multiple unit dwellings of not more than two units where one of the units is owner occupied. Denver, Colo., Rev.Mun. Code art. IV, §§ 28–95(b)(2) & 28–96(b)(2) (1991). Similarly, the Colorado Civil Rights statute exempts from the definition of "housing" any room offered for rent or lease in a single-family dwelling occupied in part by the owner. § 24–34–501(2), 10A C.R.S. (1988).

Amendment 2, however, does no such thing. Rather, it prohibits governmental entities from enacting laws barring discrimination against gay men, lesbians, and bisexuals in all contexts, regardless of the nature of the relationship involved and the extent of intimacy inherent in those relationships. Amendment 2 sweeps more broadly than necessary and is not narrowly tailored to serve the governmental interest in preserving associational privacy.

### B

Defendants next assert that because "laws and policies designed to benefit homosexuals and bisexuals have an adverse effect on the ability of state and local governments to combat discrimination against suspect classes.... Amendment 2 is an appropriate means whereby the people sought to focus government's limited resources upon those circumstances most warranting attention." In short, defendants take the position that Amendment 2 serves the compelling governmental interest in seeing that limited resources are dedicated to the enforcement of civil rights laws intended to protect suspect classes rather than having a portion of those resources diverted to the enforcement of laws intended to protect gay men, lesbians, and bisexuals.

It is well-settled that the preservation of fiscal resources, administrative convenience, and the reduction of the workload of governmental bodies are not compelling state interests. *See, e.g., Reed v. Reed,* 404 U.S. 71, 76–77, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (interest of "reducing case-load of probate courts" is not weighty enough to survive even heightened scrutiny); *Shapiro v. Thompson,* 394 U.S. 618, 633, 89 S.Ct. 1322, 1330–31, 22 L.Ed.2d 600 (1969); *Vlandis v. Kline,* 412 U.S. 441, 458–59, 93 S.Ct. 2230, 2239–40, 37 L.Ed.2d 63 (1973) (it is "obvious ... that, as the Court's assessment of the weight and value of the individual interest escalates, the less likely it is that mere administrative convenience and avoidance of hearings or investigations will be sufficient to justify what otherwise would appear to be. irrational discriminations.") (White, J., concurring).

Consequently, we conclude that defendants' asserted interest in preserving the fiscal resources of state and local governments for the exclusive use of enforcing civil rights laws intended to protect suspect classes does not constitute a compelling state interest.

Assuming that the state has some legitimate interest in preserving fiscal resources for the enforcement of civil rights laws intended to protect suspect classes, and

recognizing that combating discrimination against racial minorities and women may constitute a compelling governmental interest, *see Roberts v. United States Jaycees*, 468 U.S. 609, 623, 104 S.Ct. 3244, 3252–53, 82 L.Ed.2d 462 (1984), the evidence presented indicates that Amendment 2 is not necessary to achieve these goals.[9] The chief enforcement officer for Denver's antidiscrimination ordinance testified that Denver's protection of gay men, lesbians, and bisexuals has not prevented Denver from protecting other groups or had any significant fiscal impact on Denver. The chief of Wisconsin's Civil Rights Bureau testified, based on twelve years experience with Wisconsin's enforcement of its antidiscrimination laws, that protection of gay, lesbian, and bisexual persons has not limited enforcement of other parts of the Wisconsin statutes. The trial court found that protecting gay men, lesbians, and bisexuals from discrimination "has *not* increased costs or impaired the enforcement of other civil rights statutes or ordinances." [10] This finding is supported by the record and substantiates the conclusion that Amendment 2 is not necessary to serve the governmental interest asserted.

■ Even if protecting gay men, lesbians, and bisexuals from discrimination has some fiscal impact on the state, Amendment 2 is not narrowly tailored to serve that interest. Ensuring that certain racial, gender, or ethnic groups receive undiminished funds for civil rights enforcement could easily be accomplished by ear-marking funds to cover the costs of such enforcement. Under such an arrangement, any protection for gay men, lesbians, and bisexuals would have to be funded from sources other than funds reserved for the protection of the specified suspect classes. The governmental interest in insuring adequate resources for the enforcement of civil rights laws designed to protect suspect classes from discrimination need not be accomplished by denying the right of gay men, lesbians, and bisexuals from participating equally in the political process. Rather, this interest can be served in such way that no persons' fundamental rights need be denied.

The defendants' second asserted governmental interest in support of Amendment 2 is neither necessary nor narrowly tailored to serve that interest.

## C

■ Defendants next argue that Amendment 2 "promotes the compelling governmental interest of allowing the people themselves to establish public social and moral norms." [11] In support of this proposition, defendants define two related norms which are promoted by Amendment 2: Amendment 2 preserves heterosexual families and heterosexual marriage and, more generally, it sends the societal message condemning gay men, lesbians, and bisexuals as immoral.

9. In this regard, it is significant to note that Colorado law currently proscribes discrimination against persons who are not suspect classes, including discrimination based on age, § 24–34–402(1)(a), 10A C.R.S. (1994 Supp.); marital or family status, § 24–34–502(1)(a), 10A C.R.S. (1994 Supp.); veterans' status, § 28–3–506, 11B C.R.S. (1989); and for any legal, off-duty conduct such as smoking tobacco, § 24–34–402.5, 10A C.R.S. (1994 Supp.). Of course Amendment 2 is not intended to have any effect on this legislation, but seeks only to prevent the adoption of anti-discrimination laws intended to protect gays, lesbians, and bisexuals.

10. The trial court rejected the testimony of the defendants' witnesses who, while having no experience in the enforcement of civil rights laws intended to protect gays, lesbians, and bisexuals, speculated that doing so would create increased costs and limit the ability to enforce laws intended to protect suspect classes.

11. There is some dispute as to whether consideration of this asserted interest is properly before this court. Plaintiffs point out that in contrast to the six governmental interests addressed by the trial court, morality was not listed in the state's disclosure certificate or the state's opening statement at trial as a separate interest supporting Amendment 2.

Defendants argue that it presented the interest in public morality to the district court and as support, cites an introductory paragraph contained in its brief to that court which stated that "the issue of public morality ... permeates the discussion of compelling interests and indeed, can be regarded as a compelling interest in its own right." In our judgment, this is sufficient to conclude that the interest of public morality was presented to the trial court as a rationale for Amendment 2 and thus, this asserted interest is properly before this court.

The only authority relied on to support the view that the protection of morality constitutes a compelling governmental interest is *Barnes v. Glen Theater, Inc.*, 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). Defendants cite the plurality opinion in *Barnes* for the proposition that "the State's interest in protecting order and morality is compelling; substantial; subordinating; paramount; cogent; strong." *Barnes* does not support defendants' contention that protecting public morality constitutes a compelling governmental interest.

In *Barnes,* four Justices held that "the public indecency statute ... furthers a *substantial* government interest in protecting order and morality." *Barnes,* 501 U.S. at 567, 111 S.Ct. at 2461 (emphasis added). Justice Souter provided the fifth vote in *Barnes,* however he did not rely "on the possible sufficiency of society's moral views to justify the limitations at issue." *Id.* at 582, 111 S.Ct. at 2468 (Souter, J., concurring). Rather, he was of the opinion that the Indiana law at issue (which prohibited completely nude dancing) was permissible due to the "State's substantial interest in combating the secondary effects of adult entertainment establishments...." *Id.* None of the justices in *Barnes* concluded that furthering public morality constitutes a compelling state interest.

▇ Consequently, defendants have cited no authority to support the proposition that the promotion of public morality constitutes a compelling governmental interest, and we are aware of none. At the most, this interest is substantial. However, a substantial governmental interest is not sufficient to render constitutional a law which infringes on a fundamental right—the interest must be compelling. *See Plyler v. Doe,* 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982).

▇ Furthermore, even recognizing the legitimacy of promoting public morals as a governmental interest, it is clear to us that Amendment 2 is not necessary to preserve heterosexual families, marriage, or to express disapproval of gay men, lesbians, and bisexuals. First, we reject defendants' suggestion that laws prohibiting discrimination against gay men, lesbians, and bisexuals will undermine marriages and heterosexual families because married heterosexuals will "choose" to "become homosexual" if discrimination against homosexuals is prohibited. This assertion flies in the face of the empirical evidence presented at trial on marriage and divorce rates. For example, Wisconsin, the state with the oldest "gay rights" law in the nation, enacted in 1982, reports that the divorce rate in Wisconsin declined after the enactment of its antidiscrimination statute. *See* Center for Health Statistics, Division of Health, Wisconsin Dep't of Health & Social Services, *1990 Wisconsin Vital Statistics Report,* at p. 93, Figure 13 (divorce rates in Wisconsin peak at 3.9 divorces per 1,000 population in 1981 and decline thereafter to 3.6 divorces per 1,000 population in 1990).

Defendants also argue that the "endorsement" of homosexuality undermines marriage and heterosexual families because antidiscrimination laws implicitly endorse that conduct which is deemed an improper basis for discrimination. We are of the opinion, however, that antidiscrimination laws make no assumptions about the morality of protected classes—they simply recognize that certain characteristics, be they moral or immoral—have no relevance in enumerated commercial contexts. For instance, it is difficult to imagine how a law which prohibits employers from discriminating against anyone engaged in off-duty, legal conduct such as smoking tobacco, *see* § 24–34–402.5, 10A C.R.S. (1994 Supp.), constitutes an endorsement of smoking.

In short, prohibitions on discrimination against gay men, lesbians, and bisexuals do not imply an endorsement of any particular sexual orientation or practices. To the contrary, prohibitions on discrimination imply at most that termination of employment, eviction or denial of rental opportunities, denial of insurance coverage, and other sanctions in commercial contexts based on sexual orientation are not appropriate ways of advancing even valid moral beliefs.

Accordingly, we reject defendants' third asserted interest as a basis for finding that Amendment 2 is constitutionally valid.

## D

Defendants contend that Amendment 2 "prevents government from supporting the political objectives of a special interest group." The only argument offered to substantiate the contention that this is a compelling state interest is the following observation from *Lyng v. International Union,* 485 U.S. 360, 369, 108 S.Ct. 1184, 1191, 99 L.Ed.2d 380 (1988): "[A]t the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." (quoting *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 234–45, 97 S.Ct. 1782, 1799–1805, 52 L.Ed.2d 261 (1977)).

Defendants do not claim that the laws which Amendment 2 is intended to prohibit constitute an infringement on the First Amendment liberties identified in *Lyng.* Similarly, they do not take the position that those laws amount to a "coerc[ion] by the State" to believe anything. Rather, they assert that the laws which Amendment 2 is intended to prohibit constitute an implicit endorsement of homosexuality and that this somehow vitiates the right of individuals "to make their own judgments on this question. . . ." As explained above, however, we do not believe that antidiscrimination laws constitute an endorsement of the characteristics that are deemed an unlawful basis upon which to discriminate against individuals. *See infra* pp. 1347–1348.

More significantly, defendants offer no authority to support the rather remarkable proposition that the government has a compelling interest in seeing that the state does not support the political objectives of a "special interest group." The state exists for the very purpose of implementing the political objectives of the governed so long as that can be done consistently with the constitution. The fact that some political objectives are promoted by "special interest groups" is utterly inconsequential. Indeed, virtually any law could be regarded as a benefit to a "special interest group." If defendants' argument had any merit at all, the compelling state interest defined would justify striking down almost any legislative enactment imaginable. This is clearly not the law. No citation of authority is needed to make the point.

We reject defendants' assertion that Amendment 2 is justified by the compelling governmental interest in not having the state endorse the political objectives of a special interest group.

## E

Defendants claim that Amendment 2 "serves to deter factionalism through ensuring that decisions regarding special protections for homosexuals and bisexuals are made at the highest level of government." More specifically, they argue that "Amendment 2 is intended, not to restrain the competition of ideas," but "seeks to ensure that the deeply divisive issue of homosexuality's place in our society does not serve to fragment Colorado's body politic." Amendment 2 accomplishes this end by eliminating "city-by-city and county-by-county battles over this issue."

We reject the argument that the interest in deterring factionalism, as defined by defendants, is compelling. Political debate, even if characterized as "factionalism," is not an evil which the state has a legitimate interest in deterring but rather, constitutes the foundation of democracy. "[T]here is no significant state or public interest in curtailing debate or discussion of a ballot measure." *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 299, 102 S.Ct. 434, 439, 70 L.Ed.2d 492 (1981). *See also Williams v. Rhodes,* 393 U.S. 23, 32, 89 S.Ct. 5, 11, 21 L.Ed.2d 24 (1968). We fail to see how the state, which is charged with serving the will of the people, can have any legitimate interest in preventing one side of a controversial debate from pressing its case before governmental bodies simply because it would prefer to avoid political controversy or "factionalism." *See Police Dep't of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("government may not grant the use of a forum to people whose views it finds acceptable, but deny use

to those wishing to express less favored or more controversial views").

In support of the asserted compelling interest in deterring factionalism, defendants rely on *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). *Storer* involved a state requirement that proponents of *any* viewpoint resign from political parties and not run in those parties' primaries if the proponents intend to run as independent candidates. The purpose of this neutral election procedure was to insure that independent candidates were more than merely sore losers who, having lost one primary, ran as "independents" to satisfy "short-range political goals, pique, or personal quarrel." *Id.* at 735, 94 S.Ct. at 1282.

Neither *Storer,* nor any other case we are aware of supports the proposition that there is a compelling governmental interest in preventing divisive issues from being debated at all levels of government by prohibiting one side of the debate from seeking desirable legislation in those fora. We conclude that the interest in deterring "factionalism" is not a compelling state interest.

### F

■ Defendants argue that each of the governmental interests, while individually adequate to validate Amendment 2, "are especially so when considered in the aggregate." None of the interests identified by the state is a necessary, compelling governmental interest which Amendment 2 is narrowly tailored to advance. Lumping them together as one grandiose (and rather ill-defined) interest makes them no more necessary, compelling, or narrowly tailored. In this context, the whole *is* equal, and is as equally deficient as the sum of its parts.

### IV

■ Defendants next argue that the provisions of Amendment 2 are severable and that only those provisions pertaining to "sexual orientation" should be stricken as unconstitutional: "Plaintiffs have only challenged ... the question of sexual *orientation.* They have not claimed or made any suggestion that Amendment 2's restrictions concerning

homosexual or bisexual *conduct, practices,* and *relationships* are in any way constitutionally suspect."

In so arguing, defendants not only mischaracterize plaintiffs' position, but fundamentally misconstrue the intent of Amendment 2. In *Evans I*, we held that Amendment 2 had been shown to a reasonable probability to be unconstitutional on the grounds that it affected "the fundamental right to participate equally in the political process.... by 'fencing out' an independently identifiable class of persons...." *Id.* at 1282. The constitutional infirmity of Amendment 2 recognized in *Evans I* was not limited to sexual orientation as opposed to restrictions concerning homosexual or bisexual conduct, practices, and relationships. To the contrary, it was based on the fact that Amendment 2 sought to deny an independently identifiable group's right to participate equally in the political process.

"Whether unconstitutional provisions are excised from an otherwise sound law depends on two factors: (1) the autonomy of the portions remaining after the defective provisions have been deleted and (2) the intent of the enacting legislative body." *Robertson v. City and County of Denver,* 874 P.2d 325, 335 (Colo.1994) (quoting *City of Lakewood v. Colfax Unlimited Ass'n, Inc.,* 634 P.2d 52, 70 (Colo.1981)).

We hold that the portions of Amendment 2 that would remain if only the provision concerning sexual orientation were stricken are not autonomous and thus, not severable. In addition to denying the right of equal participation in the political process to a group based on sexual orientation, Amendment 2 also is intended to deny that same right to persons based on "homosexual, lesbian or bisexual ... conduct, practices or relationships...."

Amendment 2 targets this class of persons based on four characteristics: sexual orientation; conduct; practices, and relationships. Each characteristic provides a potentially different way of identifying that class of persons who are gay, lesbian, or bisexual. These four characteristics are not truly severable from one another because each pro-

vides nothing more than a different way of identifying the same class of persons.

The fact that there is no constitutionally recognized right to engage in homosexual sodomy, *see Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), is irrelevant. Amendment 2 by no stretch of the imagination seeks to criminalize homosexual sodomy. While it is true that such a law could be passed and found constitutional under the United States' constitution, it does not follow from that fact that denying the right of an identifiable group (who may or may not engage in homosexual sodomy) to participate equally in the political process is also constitutionally permissible. The government's ability to criminalize certain conduct does not justify a corresponding abatement of an independent fundamental right.

### V

 Last, defendants argue that even if Amendment 2 is in conflict with the Fourteenth Amendment to the United States Constitution, it is nevertheless a constitutionally valid exercise of the people's reserved powers under the Tenth Amendment.[12] In short, the argument is that the power to amend the state constitution is reserved to Colorado's voters under the Tenth Amendment, and even if the voters amend the state constitution in such a way as to violate the federal constitution, such an amendment is *per se* valid.

In support of this argument, defendants rely on *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). In *Gregory,* the Supreme Court held that the Age Discrimination in Employment Act does not apply to state court judges. In reaching this conclusion, the Court noted that decisions concerning the necessary qualification of state court judges "is a decision of the most fundamental sort for a sovereign entity. Through the structure of its government and the character of those who exercise government authority, a state defines itself as a sovereign." *Id.* at 460, 111 S.Ct. at 2400. The court concluded that "Congressional in-

terference with *this* decision of the people of Missouri, *defining their constitutional officers,* would upset the usual constitutional balance of federal and state powers." *Id.* (emphasis added).

*Gregory* applies only to cases involving federal interference with the qualification of constitutional officers. *See, e.g., Equal Employment Opportunity Comm'n v. Massachusetts,* 987 F.2d 64, 68–69 (1st Cir.1993) (*Gregory* applies only when federal law interferes with state's definition of policy-making officials' qualifications); *Tranello v. Frey,* 962 F.2d 244, 249 (2d Cir.1992) (same); *May v. Arkansas Forestry Comm'n,* 993 F.2d 632, 635–36 (8th Cir.1993) (same); *Associated Builders & Contractors v. Perry,* 817 F.Supp. 49, 53 n. 3 (E.D.Mich.1992) (same).

States have no compelling interest in amending their constitution in ways that violate fundamental federal rights. *Reitman v. Mulkey,* 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967) (no reserved power to make right to discriminate a part of the state's basic charter); *Lucas v. Colorado Gen. Assembly,* 377 U.S. 713, 736–37, 84 S.Ct. 1459, 1473–74, 12 L.Ed.2d 632 (1964) ("A citizen's constitutional rights can hardly be infringed simply because a majority of the people choose that it be.").

We reject defendants' argument that Amendment 2 is a constitutionally valid exercise of state power under the Tenth Amendment.

### VI

The state has failed to establish that Amendment 2 is necessary to serve any compelling governmental interest in a narrowly tailored way. Amendment 2 is not severable and not a valid exercise of state power under the Tenth Amendment. Accordingly, we affirm the trial court's entry of a permanent injunction barring its enforcement.

SCOTT, J., concurs.

ERICKSON, J., dissents.

---

**12.** The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

Justice SCOTT concurring:

I agree with the majority and join in its opinion and judgment. Amendment 2 is unconstitutional because it offends the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. I write separately, nevertheless, to suggest that Amendment 2 impermissibly burdens the right "peaceably to assemble and petition the government for redress of grievances," a right guaranteed to *every* citizen. Hence, the district court's permanent injunction should be upheld under the Privileges or Immunities Clause of the Fourteenth Amendment.

I

Citizenship, not the good graces of the electorate, is the currency of our republican form of government. Over 130 years ago, this nation was engaged in a great Civil War which tested our constitutional form of government as has no other time in our history. That great battle, joined to address issues of slavery and race, actually resolved much more. History teaches us that, in fact, our nation addressed a question of paramount importance: whether any state may, by legislative enactment or popular referendum, deny or refute the Union of the several states and render asunder the bonds of our constitutional form of government. Although answered at Appomatox, today we are called upon to answer, if not resolve, that question once more.

The federal Constitution, as submitted to the various states, created certain rights which the states cannot diminish. By joining the Union, Colorado "cannot be viewed as a single, unconnected, sovereign power, on [which] ... no other restrictions are imposed than may be found in its own Constitution." *Fletcher v. Peck*, 10 U.S. (6 Cranch) 85, 135, 3 L.Ed. 162 (1810). Writing for the court in *Fletcher*, Chief Justice Marshall opined that each state "is a part of a large empire, ... is a member of the American Union; and that Union has a constitution, the supremacy of which all acknowledge, and which imposes limits to ... the several states, which none claim a right to pass." Id. Thus, within the limits of state sovereignty, most important questions are decided by the electorate. However, those matters in which the result intrudes upon a protected liberty or fundamental right cannot be determined in the voting booth.

The framers originally recognized this potential for harm and understood that not every issue can be resolved by the vote of a majority. In The Federalist Papers, James Madison identified the covenant of "a well constructed Union" as its promise to protect and preserve inviolate certain rights of all citizens. The Federalist No. 10, at 42 (J. Madison) (Wills 1982). Madison noted that under other forms of government, "measures are too often decided, not according to the rules of justice, and the rights of the minor party; but by the superior force of an interested and over-bearing majority." *Id.* at 43. Madison further stated:

> The interest of the man must be connected with the constitutional rights of the place.... If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the government to control the governed; and in the next place, oblige it to control itself.
>
> ....
>
> It is of great importance in a republic, not only to guard the society against the oppression of its rulers; but to guard one part of the society against the injustice of the other part.

*Id.*, No. 51, at 262 & 264. Appropriately, Madison suggested, the "cure" rests in a republican form of government—a Union in which there is a "tendency to break and control the violence of faction." *Id.*, No. 10 at 42. The obligation to "guard one part of the society against the injustice of the other part" exists whether the oppressive act is the result of referendum or other state action. Hence, every individual is promised full citizenship under a written Constitution which, as Justice Harlan opined, "neither knows nor tolerates classes among citizens." *Plessy v.*

*Ferguson,* 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1895) (Harlan, J., dissenting).

Judge Robert Bork, addressing the same covenant, wrote of what he referred to as the "Madisonian dilemma," stating:

> The United States was founded as a Madisonian system, which means that it contains two opposing principles that must be continually reconciled. The first principle is self-government, which means that in wide areas of life majorities are entitled to rule, if they wish, simply because they are majorities. The second is that there are nonetheless some things majorities must not do to minorities, some areas of life in which the individual must be free of majority rule. The dilemma is that neither majorities nor minorities can be trusted to define the proper spheres of democratic authority and individual liberty. To place that power in one or the other would risk either tyranny by the majority or tyranny by the minority.

Robert H. Bork, The Tempting of America: The Political Seduction of the Law 139 (1990) (hereinafter "Bork"). Such a dilemma can only be resolved by resort to a neutral written principal, the Constitution. We should look first to the text and to the understanding manifested in the words used by the framers. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819) (let the end be "within the scope of the constitution, and all means which are appropriate ... which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional"); *Colorado Ass'n of Public Employees v. Lamm,* 677 P.2d 1350, 1353 (Colo. 1984) ("Where the language of the constitu-

tion is plain and its meaning clear, that language must be declared and enforced as written."); *see also* Bork at 145 ("If the Constitution is law, then presumably, like all other law, the meaning the lawmakers intended is as binding upon judges as it is upon legislatures and executives."). Where the words of the Constitution are unambiguous, we need not look further.

## II

### A

Section 1 of the Fourteenth Amendment of the United States Constitution declares: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States...." U.S. Const. amend XIV, section 1.[1] The Fourteenth Amendment, in section 1, made state citizenship derivative of national citizenship and transferred to the federal government a portion of each state's control over civil and political rights.[2]

By the force of an unfortunate history and a refusal to rely upon the plain text of the constitution, our Fourteenth Amendment jurisprudence has resulted in a Privileges or Immunities Clause that has been eclipsed by the Equal Protection and Due Process Clauses. As a consequence, no important line of decision rests solely on the Privileges or Immunities Clause. Early on, in fact, the original understanding was virtually written out of the Constitution by the United States Supreme Court in the *Slaughter–House Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873).

---

**1.** The words "privileges" and "immunities" first appear in the Constitution in article IV, § 2 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."). By virtue of Article IV, state citizenship carries with it the right to nondiscriminatory treatment within each state of citizens of all the states.

Consistent with the text and for purposes of distinction, the Article IV clause will be referred to as the "Privileges *and* Immunities Clause," and the Fourteenth Amendment clause will be referred to as the "Privileges *or* Immunities Clause."

**2.** It is widely agreed that section 1 of the Fourteenth Amendment was intended at least to empower Congress to pass the Civil Rights Act of 1866, ch. 31, 14 Stat. 27. William Nelson, The Fourteenth Amendment: From Political Principle to Judicial Doctrine 104 (1988) ("Section one was added to the amendment at least in part to remove doubts about the constitutionality of the 1866 act."); John Harrison, *Reconstructing the Privileges or Immunities Clause,* 101 Yale L.J. 1385, 1389 (1992). Many commentators have suggested that the amendment actually writes the substance of the 1866 Act into the Constitution. *See id.*

In the *Slaughter–House Cases*, decided in 1873, a majority of the Court acknowledged the Privileges or Immunities Clause of the Fourteenth Amendment, but limited its effects to those rights earlier existing under Article IV, without recognizing the creation of a new national citizenship. In his opinion for the Court in *Slaughter–House Cases*, Justice Miller declared that the rights conferred by national citizenship were those "which owe their existence to the Federal government, its National character, its Constitution, or its laws."[3] 83 U.S. (16 Wall.) at 79, 21 L.Ed. 394. A review of the legislative history, however, will not permit such an ambivalent view.[4] The statements of the framers of the Fourteenth Amendment, Senator Howard and Representative Bingham, confirm that the Privileges or Immunities Clause was originally intended to confer and make inviolate certain minimal rights embodied in national citizenship.[5]

## B

The Fourteenth Amendment Privileges or Immunities Clause was patterned after a similar clause in Article IV, Section 2.[6] The Fourteenth Amendment Clause was thought by its framers to be one of the central elements of section 1. Cong.Globe, 39th Cong., 1st Sess., part 3, p. 2765 (1866) ("This is the

first clause, and I regard it as very important.") (statement of Senator Howard); *see generally* John H. Ely, Democracy and Distrust 22 (1980) (hereinafter "Ely"); John Harrison, *Reconstructing the Privileges or Immunities Clause*, 101 Yale L.J. 1385 (1992).

The Article IV Privileges and Immunities Clause imposes substantive limits upon the states. *Corfield v. Coryell*, 6 F.Cas. 546 (No. 3230) (C.C.E.D.Pa.1825). In *Corfield*, Justice Washington held that this clause protected against state action the privileges "which are, in their very nature, fundamental; which belong, of right, to the citizens of all free governments."[7] *Corfield*, 6 F.Cas. at 551. Washington went on to state:

> What these fundamental privileges are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole.

*Id.* at 551–52.

It was this opinion which became the pole star for Representative Bingham and Sena-

---

**3.** Subsequent cases suggested an even narrower definition of the rights of national citizenship, but in *Twining v. New Jersey*, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), the Court in dictum finally settled on the *Slaughter–House* definition as correct.

**4.** As Justice Field observed in dissent, and it is not really possible to deny:

> If this inhibition ... only refers, as held by the majority of the court in their opinion, to such privileges and immunities as were before its adoption specially designated in the Constitution or necessarily implied as belonging to citizens of the United States, it was a vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage.

*Slaughter–House Cases*, 83 U.S. (16 Wall.) at 96, 21 L.Ed. 394 (Field, J., dissenting).

**5.** As Senator Howard stated: "it is certain the clause was inserted in the Constitution for some good purpose." Cong.Globe. 39th Cong., 1st

Sess., part 3, p. 2765 (1866); *see generally* John H. Ely, Democracy and Distrust 22 (1980).

**6.** Representative Bingham, the Congressperson who framed the Privileges or Immunities Clause of the Fourteenth Amendment, pointed to the Privileges and Immunities Clause of Article IV as his model. Cong.Globe, 39th Cong., 1st Sess., part 2, pp. 1033–34 (1866).

**7.** As Ely has observed, the drafters of the Fourteenth Amendment "repeatedly adverted to the *Corfield* discussion as the key to what they were writing." *See* Ely at 29; Steven J. Heyman, *The First Duty of Government: Protection, Liberty and the Fourteenth Amendment*, 41 Duke L.J. 507, 555–56 (1991). *Corfield* was invoked by both Senator Trumbull and Representative Wilson, the managers of the Civil Rights Act, to explain the fundamental rights of citizenship secured by the Act. Similarly, Senator Howard quoted from *Corfield* during the Congressional debates regarding adoption of the fourteenth amendment. Cong.Globe, 39th Cong., 1st Sess., part 3, p. 2765 (1866).

tor Howard, the framers of the Fourteenth Amendment. Presenting the Fourteenth Amendment to the Senate, Senator Howard disclosed "the views and the motives which influenced that committee," stating:

> To [the privileges and immunities listed in *Corfield* ], whatever they may be—for they are not and cannot be fully defined in their entire extent and precise nature—to these should be added the personal rights guarantied and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; *the right of the people peaceably to assemble and petition the Government for a redress of grievances, a right appertaining to each and all the people;* the right to keep and to bear arms; the right to be exempted from the quartering of soldiers in a house without the consent of the owner; the right to be exempt from unreasonable searches and seizures, and from any search and seizure except by virtue of a warrant issued upon a formal oath or affidavit; the right of an accused person to be informed of the nature of the accusation against him, and his right to be tried by an impartial jury of the vicinage; and also the right to be secure against excessive bail and against cruel and unusual punishments.

> ... it is a fact well worthy of attention that the course of decision of our courts and the present settled doctrine is, that all these immunities, privileges, rights, thus guarantied by the Constitution or recognized by it, are secured to the citizen solely as a citizen of the United States and as a party in their courts.... *The great objective of the first section of this amendment is, therefore, to restrain the power of the States and compel them at all times to respect these great fundamental guarantees.*

Cong.Globe, 39th Cong., 1st Sess., part 3, pp. 2765–66 (1866) (emphasis added).

Senator Howard's list of privileges or immunities, which incorporated *Corfield,* was representative rather than exhaustive. No case has ever attempted to identify the totality of implied federal rights guaranteed by the Privileges or Immunities clause. However, in *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), the Supreme Court did provide a list of privileges or immunities which it recognized: (1) the right to pass freely from state to state;[8] (2) *the right to petition Congress for redress of grievances;* (3) the right to vote for national officers; (4) the right to enter the public lands; (5) the right to be protected against violence while in the lawful custody of a United States Marshal; and (6) the right to inform United States authorities of violation of its laws. *Twining,* 211 U.S. at 97, 29 S.Ct. at 18–19. These rights of national citizenship receive absolute protection in the sense that the states never could have a legitimate interest in terminating completely any of these rights. Rotunda & Nowak, Treatise on Constitutional Law 351 (2d ed. 1992).

### III

The United States Supreme Court has repeatedly held that the right to vote is fundamental to the rights of citizenship and to a free and democratic society. *Burson v. Freeman,* —— U.S. ——, ——, 112 S.Ct. 1846, 1859, 119 L.Ed.2d 5 (1992); *Reynolds v. Sims,* 377 U.S. 533, 561–62, 84 S.Ct. 1362, 1381–82, 12 L.Ed.2d 506 (1963); *Yick Wo v. Hopkins,* 118 U.S. 356, 371, 6 S.Ct. 1064, 1071–72, 30 L.Ed. 220 (1886). In *Evans I,* we held the right to participate equally in the political process to be a fundamental right. *Evans v. Romer,* 854 P.2d 1270, 1282 (Colo. 1993).[9] By "participate equally," although not assuring any political result, we did con-

---

**8.** *See Edwards v. California,* 314 U.S. 160, 178, 62 S.Ct. 164, 169, 86 L.Ed. 119 (1941), (the right of interstate travel is an essential "incident of national citizenship protected by the privileges and immunities clause of the Fourteenth Amendment ...").

**9.** *See also Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979); *Dunn v. Blumstein,* 405 U.S. 330, 336, 92 S.Ct. 995, 999–1000, 31 L.Ed.2d 274 (1972); *Gordon v. Lance,* 403 U.S. 1, 5, 91 S.Ct. 1889, 1891–92, 29 L.Ed.2d 273 (1971); Frank I. Michelman, *Conceptions of Democracy in American Constitutional Argument: Voting Rights,* 41 Fla.L.Rev. 443, 459 n. 63 (1989).

template the right of the people peaceably to assemble and petition the government for a redress of grievances. This right to participate, an attribute of the new national citizenship, was meant by the framers of the Fourteenth Amendment to be a personal right guaranteed and secured by the Privileges or Immunities Clause. *See* Cong. Globe, 39th Cong., 1st Sess., part 3, pp. 2765–66 (1866).

It should be axiomatic that the right peaceably to assemble and petition government implies the ability of the duly elected representatives to respond, if so persuaded or predisposed. Yet, if enforced, Amendment 2 provides that the state, acting "through any of its branches or departments, or any of its agencies, political subdivisions, municipalities or school districts," shall not "enact, adopt or enforce any statute, regulation, ordinance or policy" granting to citizens a "claim of discrimination" based on homosexual or lesbian status or sexual orientation. Because it would prevent the General Assembly or other legislative bodies from enacting or adopting certain new laws and bar the executive department and its agencies from enforcing existing laws, Amendment 2 effectively denies the right to petition or participate in the political process by voiding, *ab initio,* redress from discrimination. Like the right to vote which assumes the right to have one's vote counted, the right peaceably to assemble and petition is meaningless if by law government is powerless to act.

## IV

Courts have been reluctant to develop a working constitutional analysis under the Privileges or Immunities Clause since the *Slaughter–House Cases,* and, unfortunately, have instead built upon the Equal Protection Clause and Due Process Clause. The Equal Protection Clause, burdened by a history and analysis beyond this context,[10] is not the most appropriate of the Fourteenth Amendment provisions for securing the right to participate equally in the political process and yet it is the primary mode of analysis relied upon by the majority in this case.[11]

Certainly all must now agree that the Fourteenth Amendment sought to protect citizens from oppression by state government. The Equal Protection Clause of that amendment mandates that rights afforded to some are granted equally to all. *See* Steven J. Heyman, *The First Duty of Government: Protection, Liberty and the Fourteenth Amendment,* 41 Duke L.J. 507 (1991). From time to time the acts of government intervene in the lives of its citizens.[12] Under the Equal Protection Doctrine, such government intervention is subjected to review, applying at least one of three standards: strict scrutiny, intermediate review, or rational basis analysis. The applicable standard of review to be applied depends upon the characteristics or attributes of the citizens involved. Under the Equal Protection Doctrine, when such governmental intervention occurs, such as with the enactment of Amendment 2 in this case, regardless of the standard applied, it is contemplated that certain abridgements of even fundamental rights are acceptable. For example, under the strict scrutiny test,

---

**10.** Historically, the Equal Protection Clause was called upon to protect insular minorities. Similarities undoubtedly exist between unlawful discrimination based on sexual orientation and that based on race or national origin. However, the record is uncertain as to whether, as a general matter, victims of discrimination based on sexual orientation share the same history or are subjected to a similar experience or condition as victims of racial or ethnic discrimination.

**11.** The defendants argue that the participation in the political process plaintiffs seek is a particular end or the successful adoption of plaintiffs' views. I note, however, that the right to participate in the political process does not guarantee plaintiffs or any other qualified electors the success of any candidate or cause nor the state's embracement of particular ideas. This right sim-

ply guarantees access to the political process. Citizens may vote, petition or amend as a matter of right, but they cannot necessarily win as a matter of right.

Moreover, I am not unmindful that the state may deny the right to vote or participate in the political process as an operation of due process. *See, e.g., Moran v. Carlstrom,* 775 P.2d 1176, 1179 (Colo.1989) (the General Assembly may place reasonable restrictions on the right to vote); *see also People v. Russo,* 713 P.2d 356, 360 (Colo.1986) (jurors disqualified if they do not have the right to vote by reason of criminal conviction).

**12.** Government intervention may take the form of agency action, legislation, constitutional amendment, or other conduct which has the effect of law.

the most exacting standard and that applied by the majority, state action is "constitutionally permissible [ ] if it is *'necessary* to promote a *compelling* state interest,' and [the state] does so in the least restrictive manner possible." Maj. op. at 1341 (citations omitted) (emphasis in original).

Unlike the Equal Protection Clause, the Privileges or Immunities Clause guarantees citizens that certain fundamental rights of national citizenship are inviolate, absent due process.[13] The syntax of the Fourteenth Amendment Clause seems inescapably that of substantive entitlement. According to Ely, "the slightest attention to language will indicate that it is the Equal Protection Clause that follows the command of equality strategy, while the Privileges or Immunities Clause proceeds by purporting to extend to everyone a set of entitlements." Ely at 24. The importance of the Privileges or Immunities Clause is that it does not require varying standards of review and that its protections are extended to *every* citizen.

## V

Under Amendment 2, the rights of citizens "peaceably to assemble and petition the government for a redress of grievances" so as to participate freely and equally in the political process are compromised in a manner prohibited by the Fourteenth Amendment. Because these political rights are fundamental and inherent in national citizenship they are protected by the Privileges or Immunities Clause. Accordingly, I concur.

## Justice ERICKSON dissenting:

I respectfully dissent. In *Evans v. Romer,* 854 P.2d 1270 (Colo.) (*Evans I*), *cert. denied,* —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993), the majority crafted a new fundamental right that had never been recognized by the United States Supreme Court or by any court other than a federal district court in Ohio that relied on *Evans I.* Ironically, judicial review of Amendment 2 has accomplished exactly what the voters who passed Amendment 2 sought to prevent—the majority has effectively created a

heightened protection for homosexuals, lesbians, and bisexuals.

In establishing what is essentially a new substantive due process right disguised as a previously unrecognized "fundamental right," the majority disregarded the warnings of Chief Justice Burger, who stated in his dissent to *Plyler v. Doe,* 457 U.S. 202, 244, 102 S.Ct. 2382, 2409, 72 L.Ed.2d 786 (1982): "If ever a court was guilty of an unabashedly result-oriented approach, this case is a prime example." Chief Justice Burger stated:

> Were it our business to set the Nation's social policy, I would agree without hesitation that it is senseless for an enlightened society to deprive any children—including illegal aliens—of an elementary education.... However, the Constitution does not constitute us as "Platonic Guardians" nor does it vest in this Court the authority to strike down laws because they do not meet our standards of desirable social policy, "wisdom," or "common sense." We trespass on the assigned function of the political branches under our structure of limited and separated powers when we assume a policymaking role as the Court does today.

*Id.* at 242, 102 S.Ct. at 2408 (citations omitted).

The majority opinion has overlooked a crucial aspect of the case before us: we are not evaluating an act of the legislature or pronouncement of the executive—we are reviewing a constitutional amendment adopted by the people of the State of Colorado. While there are certainly some initiated constitutional amendments that a majority of the electorate may attempt to visit on a minority that will not pass constitutional scrutiny, we must not ignore the fact that we are reviewing the expressed will of the citizens of this state.

In *Evans I,* we remanded the case to the district court to determine whether the preliminary injunction sustained by a majority of this court should be made permanent. The district court, following *Evans I* with great precision, made extensive findings and made the preliminary injunction permanent. Nev-

---

**13.** *See supra,* n. 11.

ertheless, people of homosexual, lesbian, or bisexual orientation have never been adjudicated to be a protected class and the right to participate equally in the political process has never been determined, apart from *Evans I*, to be a fundamental right. Accordingly, I would employ a rational relation standard to Amendment 2 and vacate the permanent injunction. For the reasons set forth in my dissent to *Evans I*, and for the reasons set forth below, I respectfully dissent.

## I

The majority relies on *Evans I* and applies the strict scrutiny standard of review to Amendment 2 because it holds that the Equal Protection Clause of the United States Constitution guarantees the fundamental right to participate equally in the political process. Maj. op. at 1339; *Evans I*, 854 P.2d at 1276. *Evans I* established this standard of review by assembling several United States Supreme Court decisions and interpreting their collective teachings as implying a new fundamental right. *See Evans I*, 854 P.2d at 1276 (citing voting cases, ballot access cases, and "cases involving attempts to limit the ability of certain groups to have desired legislation implemented through the normal political processes"). In my view, no fundamental right or suspect class is implicated by Amendment 2, and therefore the standard of judicial scrutiny applied by the majority is erroneous.

## A

The majority in *Evans I* extensively reviewed many United States Supreme Court decisions to reach its conclusion, and emphasized a line of cases relating to citizen participation in the political process. *See Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982); *Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971); *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). The majority in *Evans I* interpreted these cases to create the fundamental right to participate equally in the political process. Properly understood, however, these cases involve suspect classifications and not the

alleged fundamental right to participate equally in the political process.

In *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the United States Supreme Court addressed a violation of the Equal Protection Clause of the federal constitution. *Hunter* involved a city charter amendment that repealed a racial anti-discrimination ordinance and required voter action before such an ordinance could be enacted. *Id.* at 387, 89 S.Ct. at 558. Although *Hunter* involved the political process, the Court invalidated the amendment because it created an unjustified distinction *based on race*. The Court held:

> Because the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race, racial classifications are "constitutionally suspect," and subject to the "most rigid scrutiny." They "bear a far heavier burden of justification" than other classifications.

*Id.* at 391–92, 89 S.Ct. at 561 (citations omitted). Courts and scholars reviewing *Hunter* have recognized that the holding was predicated on an unconstitutional racial classification. *See Tyler v. Vickery*, 517 F.2d 1089, 1099 (5th Cir.1975) (stating that *Hunter* struck down an amendment that was based on a racial classification), *cert. denied*, 426 U.S. 940, 96 S.Ct. 2660, 49 L.Ed.2d 393 (1976); *Lee v. Nyquist*, 318 F.Supp. 710, 718 (W.D.N.Y.1970) ("The principle of *Hunter* is that the state creates an 'explicitly racial classification' whenever it differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area."), *aff'd*, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971); *Citizens for Responsible Behavior v. Superior Court*, 1 Cal.App.4th 1013, 2 Cal.Rptr.2d 648, 655 (4 Dist.1991) (stating that "*Hunter* was a 'strict scrutiny' case in which the law invalidly classified the affected parties on the basis of traditionally suspect characteristics"); Michael Klarman, *An Interpretative History of Modern Equal Protection*, 90 Mich.L.Rev. 213, 314 (1991) (noting that in place of a political process theory of equal protection review, racial classifications are and should be considered presumptively unconstitutional

because they should be irrelevant to decision-making); Robert H. Beinfield, Note, *The Hunter Doctrine: An Equal Protection Theory that Threatens Democracy*, 38 Vand. L.Rev. 397, 405 (1985) (suggesting that the decision in *Hunter* is based on racial classifications).

In *Washington v. Seattle School District No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), the Court applied *Hunter* and struck down a state-wide initiative to terminate the use of busing to achieve racial integration in the public schools. In finding that the initiative violated the Equal Protection Clause, the Supreme Court held:

> [T]he political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action. But a different analysis is required when the State allocates governmental power nonneutrally, by explicitly using the *racial* nature of a decision to determine the decisionmaking process. State action of this kind, the Court said, "places *special* burdens on racial minorities within the governmental process," thereby "making it *more* difficult for certain racial and religious minorities than for other members of the community to achieve legislation that is in their interest."

*Id.* at 470, 102 S.Ct. at 3195 (emphasis in original) (citations omitted). The Court thus did not approve of "distinctions based on race" and struck down the initiative because it would have created additional burdens for a class of citizens who have had historical difficulty in changing the political process. *Id.* at 486, 102 S.Ct. at 3203. *See Metro Broadcasting, Inc. v. Federal Communications Comm'n*, 497 U.S. 547, 563–65, 110 S.Ct. 2997, 3008–09, 111 L.Ed.2d 445 (1990) (holding that members of a traditionally suspect class merit special protection); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 490–91, 109 S.Ct. 706, 720–21, 102 L.Ed.2d 854 (1989) (same); *United States v. Carolene Products Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938) (noting that special protection may be offered for "discrete and insular" minority groups).

A similar issue was addressed in *Crawford v. Board of Education*, 458 U.S. 527, 102 S.Ct. 3211, 73 L.Ed.2d 948 (1982), which was announced on the same day as *Washington*. In *Crawford*, the Court upheld a state constitutional amendment that prohibited state courts from ordering mandatory student assignment or transportation. The Court stated that if the constitutional amendment employed a racial classification such as the classification in *Hunter*, the Court would apply the strict scrutiny standard of review, but found *Hunter* inapplicable because the amendment at issue did not "embody a racial classification." *Crawford*, 458 U.S. at 536–37, 102 S.Ct. at 3217.

The fact that the fundamental right created by the majority in *Evans I* has never been recognized by the Supreme Court is evident in two cases, *James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), and *Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971). In *James* and *Gordon*, the Court could have used the fundamental right found in *Evans I* and applied strict scrutiny review to strike down constitutional measures. Instead, in both cases, the Court upheld the provisions and refused to apply the strict scrutiny standard enunciated in *Hunter*.

In *James*, the Supreme Court upheld the validity of a California constitutional measure that prohibited state public bodies from developing, constructing, or acquiring low-income housing projects until voters approved of the project in a referendum. Thus, the citizens singled out in *James* were low-income people who would qualify for low-rent housing and therefore the Court did not apply strict scrutiny. The Supreme Court said:

> Unlike the case before us, *Hunter* rested on the conclusion that Akron's referendum law denied equal protection by placing "special burdens on racial minorities within the governmental process." ... Unlike the Akron referendum provision, it cannot be said that California's Article XXXIV rests on "distinctions based on race." ... The present case could be affirmed only by

extending *Hunter*, and this we decline to do.

*James*, 402 U.S. at 140–41, 91 S.Ct. at 1333.

Similarly, in *Gordon*, the plaintiffs challenged West Virginia's constitutional provision that required a sixty-percent approval for any bonded indebtedness incurred by the political subdivisions of the state. As in *James*, the Supreme Court did not apply the strict scrutiny standard of review because:

> Unlike the restrictions in our previous cases, the West Virginia Constitution singles out no "discrete and insular minority" for special treatment.... We are not, therefore, presented with a case like *Hunter*, ... in which fair housing legislation alone was subject to an automatic referendum requirement. The class singled out in *Hunter* was clear—"those who would benefit from laws barring racial, religious, or ancestral discriminations."

*Gordon*, 403 U.S. at 5, 91 S.Ct. at 1891–92. *James* and *Gordon* demonstrate that strict scrutiny should not be applied to review a restriction on the political process unless the restriction singles out a discrete and insular minority.[1] The Supreme Court of the United States has never held, however, that the right to participate equally in the political process is a fundamental right.

## B

The development of fundamental rights in our jurisprudence has never been a matter for ad hoc determination. *See Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 151–52, 82 L.Ed. 288 (1937) (stating that fundamental rights are those that are "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [they] were sacrificed"); *Moore v. East Cleveland*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977) (noting that fundamental rights are liberties that are "deeply rooted in this Nation's history and tradition"); *see also Bowers v. Hardwick*, 478 U.S. 186, 191–92, 106 S.Ct. 2841, 2844–45, 92 L.Ed.2d 140 (1986); *Griswold v. Connecticut*,

381 U.S. 479, 481–86, 85 S.Ct. 1678, 1679–83, 14 L.Ed.2d 510 (1965). Fundamental rights must be explicitly or implicitly guaranteed by the United States Constitution. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33–34, 93 S.Ct. 1278, 1296–97, 36 L.Ed.2d 16 (1973). Among the fundamental rights delineated by the Supreme Court are the right to vote, the right to interstate travel, the right to privacy, and the guarantees contained in the First Amendment. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 101, 92 S.Ct. 2286, 2293, 33 L.Ed.2d 212 (1972) (First Amendment); *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (interstate travel); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1966) (voting); *Griswold*, 381 U.S. at 484, 85 S.Ct. at 1681–82 (privacy).

The Court has been reluctant to recognize new rights as fundamental. *See Bowers*, 478 U.S. at 195, 106 S.Ct. at 2846 ("There should be, therefore, great resistance to expand the substantive reach of [the Due Process Clauses], particularly if it requires redefining the category of rights deemed to be fundamental."); Geoffrey Stone, et al., *Constitutional Law*, at 831 (1986) (stating that the Court "has essentially frozen the list of 'fundamental' interests"). The Court has refused to declare education, housing, the right to refuse medical treatment, welfare payments, or governmental employment to be fundamental rights worthy of heightened constitutional protection. *See Cruzan by Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 280, 110 S.Ct. 2841, 2852, 111 L.Ed.2d 224 (1990) (right to refuse medical treatment); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (employment); *Rodriguez*, 411 U.S. at 35, 93 S.Ct. at 1297–98 (education); *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161–62, 25 L.Ed.2d 491 (1970) (welfare). Never before has any court recognized the right to participate equally in the political process as a

---

1. Homosexuals, lesbians, and bisexuals have never been adjudicated to be a discrete and insular minority by the Supreme Court. *See High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 571 (9th Cir.1990); *Dahl v. Secretary of the United States Navy*, 830 F.Supp. 1319, 1323–25 (E.D.Cal.1993).

fundamental right, the curtailing of which warrants strict judicial scrutiny.[2] "It is not the province of this Court to create substantive constitutional rights in the name of guaranteeing equal protection of the laws." *Rodriguez,* 411 U.S. at 33, 93 S.Ct. at 1297.

It is crucial to note, however, that even though equal participation in the political process does not merit strict scrutiny analysis, the United States Constitution offers protection for those who may be adversely affected by legislation. When individuals or groups are singled out, as they have been here, they may still be protected by the Due Process Clauses or the Equal Protection Clause.[3] In this case, the class of citizens is protected by the Equal Protection Clause. Accordingly, Amendment 2 must be struck down only if its challengers can demonstrate that the legislation is not rationally related to a legitimate state interest.

## II

During oral argument before this court, counsel for the plaintiffs-appellees asserted that even if strict scrutiny review were inappropriate, we should analyze Amendment 2 under a rational basis standard of review. Counsel noted that in *Heller v. Doe by Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993), the Supreme Court did not engage in strict scrutiny review because it was not properly preserved at the lower levels and therefore urged this court not to preclude rational basis review by ruling merely under strict scrutiny standards. I find counsel's contention persuasive and therefore address Amendment 2 under a rational relation standard.

## A

In reviewing an act of the legislature or a voter-mandated constitutional amendment that creates a classification involving neither a fundamental right nor suspect classes, a court will review the classification under the "rational basis" standard of review. *See Heller,* —— U.S. at ——, 113 S.Ct. at 2642; *Kadrmas v. Dickinson Public Sch.,* 487 U.S. 450, 462, 108 S.Ct. 2481, 2489–90, 101 L.Ed.2d 399 (1988). Under the rational basis standard of review, the classification will be "upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Federal Communications Comm'n v. Beach Communication, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993); *see also Sullivan v. Stroop,* 496 U.S. 478, 485, 110 S.Ct. 2499, 2504, 110 L.Ed.2d 438 (1990); *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949–50, 59 L.Ed.2d 171 (1979); *Dandridge,* 397 U.S. at 484–85, 90 S.Ct. at 1161–62. "Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller,* —— U.S. at ——, 113 S.Ct. at 2642; *see also Nordlinger v. Hahn,* —— U.S. ——, ——, 112 S.Ct. 2326, 2331–32, 120 L.Ed.2d 1 (1992).

The inquiry into whether there is a rational basis for the classification, however, does not authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations." *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) *(per curiam).* Instead, a classification that involves neither suspect classes nor fundamental rights is accorded a strong presumption of validity. *Beach Communication,* —— U.S. at ——, 113 S.Ct. at 2098; *Hodel v. Indiana,* 452 U.S. 314, 331–332, 101 S.Ct. 2376, 2386–87, 69 L.Ed.2d 40 (1981); *Murgia,* 427 U.S. at 314, 96 S.Ct. at 2567.

---

**2.** Recently, however, a federal district judge, relying on *Evans I,* struck down an anti-gay-rights measure approved by Cincinnati voters. In *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati,* 860 F.Supp. at 430 (S.D.Ohio 1994), the federal district court declared that a City Charter Amendment was unconstitutionally vague and violated the First Amendment right of homosexuals to participate in the political process. See also *Equality Found. v. City of Cincinnati,* 838 F.Supp. 1235 (S.D.Ohio 1993).

**3.** When fundamental rights are denied to everyone, it raises due process concerns. When fundamental rights are denied to some individuals only, it raises equal protection concerns. The applicable standard in either case, however, is strict scrutiny.

Because of the strong presumption of validity, the purpose or rationale behind the legislation need not be articulated at any time. *Heller,* —— U.S. at ——, 113 S.Ct. at 2642; *Nordlinger,* —— U.S. at ——, 112 S.Ct. at 2334; *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 528, 79 S.Ct. 437, 441–42, 3 L.Ed.2d 480 (1959). Additionally, the party challenging the classification bears the burden of "negat[ing] every conceivable basis which might support it" whether or not it is supported by the record. *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973); *see also Heller,* —— U.S. at ——, 113 S.Ct. at 2643.

In an effort to ensure that rational basis review does not become a "license for courts to judge the wisdom, fairness, or logic of legislative choices," *Beach Communication,* —— U.S. at ——, 113 S.Ct. at 2101, the reasons articulated are given great deference. *See Id.* at 2098 ("[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."); *Gregory v. Ashcroft,* 501 U.S. 452, 470–71, 111 S.Ct. 2395, 2406–07, 115 L.Ed.2d 410 (1991) ("In cases where a classification burdens neither a suspect group nor a fundamental interest, 'courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws.'") (citation omitted); *Paris Adult Theater I v. Slaton,* 413 U.S. 49, 62, 93 S.Ct. 2628, 2637–38, 37 L.Ed.2d 446 (1973) ("The fact that a congressional directive reflects unprovable assumptions about what is good for the people, including imponderable aesthetic assumptions, is not a sufficient reason to find that statute unconstitutional."); *Dandridge,* 397 U.S. at 485, 90 S.Ct. at 1161–62 (noting that a classification does not fail because "in practice it results in some inequality") (citation omitted); *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific."); *see also* Laurence Tribe, *American Constitutional Law* 1440 (2d ed. 1988) ("Within very broad limits, courts have traditionally exhib-

ited extreme deference to the legislative definition of 'the general good,' either out of judicial sympathy for the difficulties of the legislative process, or out of a belief in judicial restraint generally."); John Nowak, Ronald Rotunda, Nelson Young, *Constitutional Law* 596 (2d ed. 1983) ("A majority of the justices today will uphold governmental classifications under this standard unless no reasonably conceivable set of facts could establish a rational relationship between the classification and an arguably legitimate end of government."); Mark Strasser, *Suspect Classes and Suspect Classifications: On Discriminating, Unwittingly or Otherwise,* 64 Temp.L.Rev. 937, 941 (1991) ("The rational basis test is notoriously weak. When applied, there is 'little doubt about the outcome; the challenged legislation is always upheld.'") (quoting *Murgia,* 427 U.S. at 319, 96 S.Ct. at 2569–70 (Marshall, J. dissenting)); *but see City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 447, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985) (striking down on rational basis review a zoning law that prohibited mentally retarded individuals from residing in certain areas of town because the law was based on the "bare ... desire to harm a politically unpopular group") (citation omitted). This is so because:

> The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted. Thus, we will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.

*Vance,* 440 U.S. at 97, 99 S.Ct. at 942–43 (footnote omitted). Although the purposes and rationale of a voter initiative are even more difficult to assess than legislative pronouncements, initiatives passed by the citizens of the state which contain classifications not related to fundamental rights or suspect classes are also given deference. *See Grego-*

*ry,* 501 U.S. at 470, 111 S.Ct. at 2406 (applying the rational basis standard to a constitutional restriction enacted by the people); *MSM Farms, Inc. v. Spire,* 927 F.2d 330, 333 (8th Cir.1991) (applying a rational basis test to measures adopted through a referendum).

It is the prerogative of the people of the State of Colorado, and not this or any other court, to weigh the evidence and determine the wisdom and utility of the purposes behind a measure adopted through the initiative process. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 469, 101 S.Ct. 715, 726–27, 66 L.Ed.2d 659 (1981) (stating that the Minnesota Supreme Court erred in substituting its judgment for that of the legislature). Thus, whether in fact Amendment 2 will meet its objectives is not the relevant question: the Equal Protection Clause is satisfied if the people of Colorado could have rationally decided that prohibiting homosexuals, lesbians, and bisexuals from enacting certain legislation might further a legitimate interest. *Hawaii Housing Auth. v. Midkiff,* 467 U.S. 229, 242, 104 S.Ct. 2321, 2330, 81 L.Ed.2d 186 (1984); *Clover Leaf Creamery,* 449 U.S. at 466, 101 S.Ct. at 725.

Amendment 2 was put to a plebiscite by initiative petitions and eventually won voter approval by 813,966 votes to 710,151 votes. Because Amendment 2 was a product of a vote of the citizens of Colorado, no purpose or rationale for Amendment 2 was explicitly set forth. *See MSM Farms,* 927 F.2d at 332 ("Because the law was adopted through the initiative and referendum process, there is little traditional legislative history regarding its purpose."). However, the state has articulated several rationale in this court and in the district court to establish that the inter-

est behind Amendment 2 is not only a rational interest but also a compelling state interest.[4]

## III

Although only one legitimate state interest rationally related to the state's goals for a constitutional amendment is necessary, the state has set forth several. The district court found that two rationale—the promotion of religious freedom and the promotion of family privacy—demonstrated compelling state interests, although it found that the means for achieving the interests were not narrowly tailored to achieve the objectives.[5] In my view, there are at least three interests that satisfy the constitutional standard and those asserting the invalidity of Amendment 2 have not met their burden of demonstrating that there is no rational basis for the constitutional amendment.

## A

The state asserts that the rational basis of Amendment 2 is that it prevents the government from interfering with religious privacy. The root of the state's contention is that under ordinances preempted by Amendment 2, individual landlords or employers, including churches, who have profound religious objections to homosexuality, would nonetheless be compelled to compromise those convictions under threat of government sanctions. Thus, Amendment 2 prevents any political body from enacting legislation that would hinder the right of individuals to choose who to rent to or who to employ on religious grounds. The district court found that "[p]reserving religious freedom is a compelling state interest" but that Amendment 2

4. The district court found that the state alleged six compelling state interests: (1) deterring factionalism; (2) preserving the integrity of the state's political functions; (3) preserving the ability of the state to remedy discrimination against suspect classes; (4) preventing the government from interfering with personal, familial and religious privacy; (5) preventing the government from subsidizing the political objectives of a special interest group; and (6) promoting the physical and psychological well-being of children.

5. The district court applied the strict scrutiny standard of review which requires the state to prove that classifications affecting fundamental

rights were necessary to promote a compelling or overriding interest which is narrowly tailored. *See Plyler v. Doe,* 457 U.S. 202, 217, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982) (noting that the classification must be "precisely tailored"); *Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972) (stating a classification involving a fundamental right must be a compelling state interest); *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (noting that there needed to be a compelling reason for the government to restrict interstate travel).

was "not narrowly drawn to achieve that purpose in the least restrictive manner possible."

Freedom of individuals to practice and hold particular religious beliefs is among the highest values in our society. *See Murdock v. Pennsylvania,* 319 U.S. 105, 115–17, 63 S.Ct. 870, 876–77, 87 L.Ed. 1292 (1943); *Jones v. Opelika,* 319 U.S. 103, 104, 63 S.Ct. 890, 87 L.Ed. 1290 (1943); *see also Martin v. Struthers,* 319 U.S. 141, 149–50, 63 S.Ct. 862, 866–67, 87 L.Ed. 1313 (1943) (Murphy, J., concurring). It is not within the discretion of this or any court to determine which beliefs are valid because "courts are not the arbiters of scriptural interpretation." *United States v. Lee,* 455 U.S. 252, 257, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982). In fact, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit [free exercise] protection." *Thomas v. Review Bd.,* 450 U.S. 707, 714, 101 S.Ct. 1425, 1430, 67 L.Ed.2d 624 (1981). Not only is it impermissible for courts to determine the validity of religious practices and beliefs, but no government official or body may delineate what is a "proper" form of faith and require citizens to act in accordance with government-mandated religious standards. *See West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by work or act their faith therein.").

Nevertheless, not all burdens on religion are unconstitutional. *Lee,* 455 U.S. at 257, 102 S.Ct. at 1055; *Thomas,* 450 U.S. at 718, 101 S.Ct. at 1432 (stating that "only those interests of the highest order ... can overbalance legitimate claims to the free exercise of religion"). Even the highest values, including religious freedom, must sometimes give way to the greater public good. *See Sherbert v. Verner,* 374 U.S. 398, 403, 83 S.Ct. 1790, 1793–94, 10 L.Ed.2d 965 (1963). Thus, governmental actions that substantially burden a religious practice must be justified by a compelling governmental interest. *Em-*

*ployment Div. v. Smith,* 494 U.S. 872, 883, 110 S.Ct. 1595, 1602–03, 108 L.Ed.2d 876 (1990).

In this case, the state asserts that Amendment 2 is an attempt to protect religious freedom by precluding legislation that would threaten sanctions against those who would refuse to employ or rent to homosexuals, lesbians, and bisexuals. The state indicates several examples of instances in which individuals or groups were forced to set aside their religious beliefs based on legislative enactments protecting homosexuals. In Aspen, for example, section 13–98 of the sexual orientation ordinance required churches to open their facilities to homosexual organizations if the facilities were opened to any community organization. Churches apparently could not refuse to hire employees, including pastors or priests, on the basis of their sexual orientation. Similarly, Title 12 of the Boulder Municipal Code did not allow a church or religious organization with deeply held moral and religious views on the subject of homosexuality to refuse to hire someone based on his or her sexual orientation.

In my view, the state has a legitimate interest in protecting religious freedoms and Amendment 2 bears a rational relationship to that interest.

B

Although the district court found that the state did not have a compelling interest in deterring "factionalism," or "political fragmentation," the state does have a legitimate interest in promoting state-wide uniformity and Amendment 2 is rationally related to that interest.

Prohibiting local action on matters affecting the entire state is advantageous inasmuch as the state has an interest in uniformity of regulation:

The central inquiry implicit in the concept of pre-emption is whether there should be statewide uniformity in the regulation of specific conduct. If there is no need for statewide uniformity, there is no need for state law to preempt local power to regulate ... This is the core of the preemption

question—to consider, on the one hand, the need for statewide uniformity of regulation of a specific type of conduct, and, on the other hand, the need of local governments to be able to respond to local, as distinguished from statewide problems.

Daniel R. Mandelker & Dawn C. Netsch, *State and Local Government in a Federal System* 237 (1977); *see also* Osborne M. Reynolds, *Local Government Law* 120 (1982) (stating that the critical inquiry in the context of state preemption of local law is: "[I]s this an area where it is desirable to have a single, all-encompassing scheme of regulation, so that local laws—not just local laws that conflict with the state's, but *any* local laws—would unduly complicate the picture?"); Charles S. Rhyne, *The Law of Local Government Operations* § 19.11 (recognizing that preemption is rooted in the necessity of statewide uniformity of regulation).

In determining what is a matter of statewide concern, this court has not set forth a strict legal standard. Instead, we have determined the nature of the concern on an ad hoc basis. *See Denver & Rio Grande Western R.R. Co. v. City & County of Denver*, 673 P.2d 354, 358 (Colo.1983). In *City & County of Denver v. State*, 788 P.2d 764, 767 (Colo. 1990), we stated:

> Although we have found it useful to employ the "local," "mixed," and "state-wide" categories in resolving conflicts between local and state legislation, these legal categories should not be mistaken for mutually exclusive or factually perfect descriptions of the relevant interests of the state and local governments. Those affairs which are municipal, mixed or of statewide concern often imperceptibly merge.

State regulation is a matter of statewide concern in a broad variety of contexts. *See Robertson v. City & County of Denver*, 874 P.2d 325, 350 (Colo.1994) (Erickson, J., dissenting).

In this case, the state has a legitimate interest in promoting Amendment 2 because it is a matter of statewide concern. Amendment 2 involves a matter of statewide concern because the public is deeply divided over the issue of homosexuality.[6] In fact, civil rights has never been the type of concern reserved exclusively for local governments.[7] By adopting Amendment 2, the people of the state have sought to ensure that the government will act on a uniform basis. Several local governments, such as Denver, Aspen, and Boulder enacted sexual orientation laws, while others did not. By voting to approve Amendment 2, the voters of Colorado indicated that they wanted a statewide resolution of the issue that had formerly only been locally regulated and subject to great debate. The citizens of the state have a right to the initiative process which resolves conflicts between municipal and local governments when the issue is a matter of statewide concern and the process is not repugnant to the constitution.[8] The Supreme Court has noted that "referendums demonstrate devotion to democracy, not to bias, discrimination, or prejudice."[9] *James*, 402 U.S. at 141, 91 S.Ct. at 1334.

---

**6.** The issue of homosexuality and bisexuality is deeply controversial and divisive. Unlike race and sex, there is no national consensus that sexual orientation is an inappropriate basis for governmental, much less private, decisionmaking. A series of constitutional amendments and acts of Congress have authoritatively settled the place of race and sex in American life. The same simply cannot be said of non-traditional sexual orientation.

**7.** For example, in 1989, the General Assembly passed a law prohibiting insurance companies from inquiring about or making coverage decisions on the basis of sexual orientation. *See* § 10–3–1104(1)(f), 4A C.R.S. (1993 Supp.). In 1992, the Colorado Civil Rights Commission went on record recommending legislation adding sexual orientation to the list of protected classes.

**8.** Testimony of Harvard Government Professor Harvey Mansfield indicated that the use of the initiative process to enact Amendment 2 supported stability and respect for the political process, by giving "the people a sense that ... government is not alien to them, and that they can get together by their own initiative ... to produce a result that gives them a sense of satisfaction and accomplishment."

**9.** The Court in *James* went on to cogently state:

> But of course a lawmaking procedure that "disadvantages" a particular group does not always deny equal protection. Under any such holding, presumably a State would not be able to require referendums on any subject unless referendums were required on all, because they would always disadvantage some group.

In my view, the state has a legitimate interest in promoting statewide uniformity in matters of statewide concern and Amendment 2 bears a rational relationship to that interest.

## C

The state also contends that it has a legitimate interest in allocating its resources. Specifically, the state suggests that laws prohibited by Amendment 2 would drain the state's financial and labor resources set aside and budgeted for the protection of traditionally suspect classes and diminish respect for traditional civil rights categories.

In this case, the testimony reflected that, although there was no current statute that required the state to enforce civil rights legislation on behalf of homosexuals, lesbians, and bisexuals, any such statute would decrease the funding available to enforce existing laws protecting traditionally suspect classes.[10] For example, the investigative arm of the Civil Rights Commission has experienced steadily increasing demands upon a shrinking budget. Two out of the last three years, the Division has been unable to fulfill its part of a federally funded workshare agreement.[11] The Division received complaints from the black community that claims were not being thoroughly investigat-

ed and prosecuted. The state, therefore, reasonably postulates that a law requiring the protection of an additional group would further stretch scarce resources, and Amendment 2 protects the civil rights enforcement for traditionally suspect groups.[12] Thus, the decision of the people of the State of Colorado to allocate government resources in a particular manner is a legitimate state interest in this case. See Dukes, 427 U.S. at 303, 96 S.Ct. at 2516–17 (upholding a New Orleans ordinance noting that states have wide latitude in regulating their local economies); James, 402 U.S. at 143, 91 S.Ct. at 1334–35 (noting that a referendum procedure "ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds" and therefore found that a referendum measure did not violate the Equal Protection Clause).

Additionally, the state has a legitimate interest in ensuring that the traditionally suspect classes remain respected. See Crawford, 458 U.S. at 539, 102 S.Ct. at 3218–19 ("And certainly the purposes of the Fourteenth Amendment would not be advanced by an interpretation that discouraged the States from providing greater protection to racial minorities."). Professor Joseph Broadus testified that the addition of homosexuals to civil rights statutes or ordinances would

And this Court would be required to analyze governmental structures to determine whether a gubernatorial veto provision or a filibuster rule is likely to "disadvantage" any of the diverse and shifting groups that make up the American people.
James v. Valtierra, 402 U.S. 137, 142, 91 S.Ct. 1331, 1334, 28 L.Ed.2d 678 (1971).

**10.** In United States v. Carolene Products Co., 304 U.S. 144, 152, 58 S.Ct. 778, 783–84, 82 L.Ed. 1234 (1938), the Supreme Court announced its standard for reviewing legislative enactments in the economic sphere:
[T]he existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators.

**11.** Under the agreement, the Division works on a certain number of cases involving only federally-protected classes which, of course, does not in-

clude sexual orientation. The Division only met the goals last year because the Equal Employment Opportunities Commission reduced the number of cases necessary to satisfy the agreement.

**12.** The United States Supreme Court has addressed the issue of fiscal concerns impacting certain rights. In Plyler, 457 U.S. at 222–24, 102 S.Ct. at 2397–98 the Court held that whatever savings might be achieved by the state by denying public education to undocumented aliens were insubstantial compared to the costs to the children, the state, and the nation of not educating them. In Shapiro, 394 U.S. at 618, 89 S.Ct. at 1322, and in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Court found fiscal integrity not to be a compelling interest balanced against the right to interstate travel and the right to welfare assistance to aliens. These cases are distinguishable as either fundamental rights cases or cases in which the object was saving money not a basic allocation of funds.

lessen the public's respect for historic civil rights categories. Testimony also indicated that, unlike the traditionally suspect classes, homosexuals, lesbians, and bisexuals are a relatively politically powerful and privileged special interest group. Indeed, former Civil Rights Commission Chairman Ignacio Rodriguez testified that the inclusion of homosexuals as a suspect class would represent a "drastic departure" from the historical aims of the civil rights laws.

The State of Colorado, through entities such as the Colorado Civil Rights Division, has attempted to further the interest in remedying specific instances of sexual and racial discrimination through existing civil rights laws and enforcement programs. However, owing to the fiscal constraints which are inevitably a part of public administration, unlimited funds are not available for this purpose. Therefore, it is incumbent upon the state to set priorities for its enforcement efforts. In this case, the setting of priorities is a legitimate state interest and Amendment 2 is rationally related to that interest.

### IV

In my view, the correct standard of judicial review of Amendment 2 is a rational basis standard of review. Additionally, the plaintiffs have not shown that Amendment 2 is not rationally related to the state's legitimate interest in protecting religious freedom, encouraging statewide uniformity in the law, and allocating resources. Accordingly, I would reverse the decision of the district court and vacate the injunction. Therefore, I dissent.